UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
YU WEI CAO and YU CONG WEI, individually
and on behalf of all other employees
similarly situated,

                    Plaintiffs,

                                              <u>MEMORANDUM, DECISION, &</u>
         -against-                            <u>ORDER AFTER BENCH TRIAL</u>
                                              15-CV-0266(JS)(ARL)
MIYAMA, INC., doing business as Ruby
Sushi; W ASIAN CUISINE INC., doing
business as Ruby Sushi; RUBY ASIAN
CUISINE, INC., doing business as Ruby
Sushi; XI CHEN; MU JIN CHEN; and MING
HANG WANG,

                    Defendants.
--------------------------------------X
APPEARANCES
For Plaintiffs:     Keli Liu, Esq.
                    Jian Hang, Esq.
                    William M. Brown, Esq.
                    Hang & Associates, PLLC
                    136-20 38th Avenue, Suite 10G
                    Flushing, New York 11354


For Defendants
W Asian Cuisine Inc.,
Ruby Asian Cuisine,
Inc., Xi Chen, and
Ming Hang Wang:     Ricardo R. Morel, Esq.
                    Law Office of Ricardo Morel
                    39-15 Main Street, Suite 318
                    Flushing, New York 11354


Miyama, Inc. and
Mu Jin Chen:        No appearances.

SEYBERT, District Judge:

Plaintiffs Yu Wei Cao ("Cao") and Yu Cong Wei ("Wei") commenced this action against defendants Miyama, Inc., doing business as Ruby Sushi ("Miyama"); W Asian Cuisine Inc., doing business as Ruby Sushi ("W Asian Cuisine"); Ruby Asian Cuisine, Inc., doing business as Ruby Sushi ("Ruby Asian Cuisine"); Xi Chen; Mu Jin Chen; and Ming Hang Wang ("Wang," and collectively, "Defendants") seeking to recover unpaid overtime wages and other damages arising from Defendants' alleged violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), and the New York Labor Law, N.Y. Labor Law §§ 1, et seq. ("NYLL"). (See generally Am. Compl., D.E. 53.)  This Court held a bench trial on January 4, 2019.  (See generally Trial Tr. ("Tr."), D.E. 84-1, at 2-39.) [1]  This Memorandum, Decision, and Order contains the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a)(1).

## FINDINGS OF FACT

Based on the evidence presented, the Court makes the following findings of fact.  They are drawn from witnesses'

---

[1] Cao did not appear for trial, his claims were not discussed at trial, and Plaintiffs' counsel have represented that they have been unable to contact him.  (Dec. 2018 Letter, D.E. 74.) Additionally, Mu Jin Chen and Miyama have not appeared in this action, and Wei did not testify that he ever worked for Mu Jin Chen or Miyama.  (See Tr.)  Accordingly, Cao's claims against all Defendants and Wei's claims against Miyama and Mu Jin Chen are DISMISSED WITH PREJUDICE.

testimony at trial, the parties' trial exhibits, and the undisputed facts submitted by the parties in the Joint Pretrial Order ("JPTO," D.E. 68.)[2]

## I. Defendants

Xi Chen owned and operated Ruby Asian Cuisine, (JPTO § VII.3), through which she ran the restaurant Ruby Asian Fusion and Sushi Bar ("Ruby Asian Fusion") located in Woodbury, New York, (Tr. 57:25-58:5). Ruby Asian Fusion went out of business on October 31, 2018. (Tr. 58:6-12.)

Wang owns and operates W Asian Cuisine, (JPTO § VII.5), through which he runs the restaurant Ruby Sushi located in Plainview, New York, (Tr. 40:22-41:3). Wang purchased the restaurant from Mu Jin Chen and his company, Miyama, in 2008.[3] (Tr. 46:21-47:14; 54:3-15.)

Wang and Xi Chen are husband and wife. (Tr. 58:23-25.)

## II. Wei's Work at the Restaurants

Wei worked for Xi Chen's restaurant, Ruby Asian Fusion in Woodbury, from August 15, 2016 to December 20, 2016. (Tr. 37:18-38:1; Tr. 60:22-61:8; see also Tr. 6:4-11.)

---

[2] On October 25, 2018, the Proposed Joint Pretrial Order was approved for filing by Magistrate Judge Arlene R. Lindsay. (See Minute Entry, D.E. 69.)

[3] Wang first testified that he did not buy his restaurant from Mu Jin Chen, (Tr. 47:12-14), but later testified that he did, (Tr. 49:10-15, 54:12-18).

The parties dispute whether Wei also worked one day per week at Wang's restaurant, Ruby Sushi in Plainview, during that time. Wei testified that he worked at Ruby Sushi every Tuesday between August 15 and December 20, 2016. (Tr. 6:12-24, 16:22-17:2, 37:18-38:9.) Xi Chen insisted that he did not, (Tr. 60:18-61:17), and Wang suggested the same, (see Tr. 42:13-43:23), though defense counsel never asked Wang whether Wei worked there, (see Tr. 40:22-55:25).

The Court credits Wei's testimony regarding his work at Ruby Sushi. When asked during cross-examination whether Wang's restaurant in Plainview said "W Asian Cuisine" on the outside, Wei--without hesitation--testified, "I rarely entered through the front. I always mostly [sic] entered through the back. In the back it just says Ruby Sushi." (Tr. 36:10-14.) This testimony struck the Court as unrehearsed and truthful.

In contrast, the Court did not find Xi Chen's testimony on this point to be credible. First, on one occasion, she specified the restaurant at which Wei was working: "Sometimes when [Wei] was working at my Woodbury restaurant . . . he [would] leave early." (Tr. 93:9-14.) This suggests that Wei sometimes worked at the Woodbury restaurant and sometimes worked at the Plainview restaurant.

Second, a prior sworn statement Xi Chen submitted to the Court undermines her testimony that Wei never worked at Ruby Sushi.

At trial, she testified that she calculated Wei's hours based on the hours her restaurant was open, and she concluded that he could not have worked more than fifty (50) hours per week. (Tr. 101:12-23, 103:17-22.) And according to Xi Chen, the restaurant was open for a total of fifty-eight and one-half (58.5) hours per week.[4] Thus, according to Xi Chen, Wei worked up to fifty of the fifty-eight and one-half hours the restaurant was open per week, or every day the restaurant was open except for only one of the eight-and-one-half-hour days between Monday and Thursday. This accords with Wei's testimony that he worked for a total of five and one-half days per week, with Sunday being the half day. (Tr. 9:25-10:4.) However, Xi Chen's prior sworn statement to the Court provides that her "[w]orkers are off two (2) days a week. So they only work 4 1/2 days." (Xi Chen Aff., D.E. 49, ¶ 8.)

The Court sees three possible explanations for this contradiction: (1) Xi Chen's trial testimony suggesting that Wei worked five and one-half days per week was incorrect; (2) the

---

[4] Xi Chen testified that Ruby Asian Fusion was open between 11:30 am and 3:00 pm and between 4:30 pm and 9:30 pm on Mondays, Tuesdays, Wednesdays, and Thursdays, (Tr. 95:20-22); between 11:30 am and 3:00 pm and between 4:30 pm and 10:30 pm on Fridays, (Tr. 95:12-19; Ruby Asian Fusion Menu, Pl. Ex. 4, D.E. 79-4); between 4:30 pm and 9:30 pm on Sundays, (Tr. 67:15-20); and though she did not testify to the restaurant's hours on Saturdays, she claimed that the menu otherwise correctly reported the hours, which on Saturdays were between 12:30 pm and 10:30 pm, (Tr. 95:1-4; Ruby Asian Fusion Menu). These hours total fifty-eight and one-half per week.

statement in her affidavit that employees worked only four and one-half days per week was incorrect; or (3) she accurately affirmed that employees worked at Ruby Asian Fusion only four and one-half days per week, she accurately suggested in her testimony that Wei worked five and one-half days per week, and she falsely denied that Wei worked one of his five and one-half days per week at Ruby Sushi in Plainview. Considering Wei's credible testimony, the third explanation is most plausible.

Finally, the Court did not find Wang to be a credible witness. Testifying about another issue, he stated that he learned of the existence of Miyama in 2014. (Tr. 46:18-47:8.) Additionally, in 2017, he submitted an affidavit to the Court providing that he did not "know who Mu Jin Chen is." (Wang Aff., Pl. Ex. 10, D.E. 79-10, ¶ 6(e); see Tr. 48:17-49:1.) However, when pressed at trial, he testified that he had met Mu Jin Chen in 2008. (Tr. 48:24-49:18.) He testified further that he bought Mu Jin Chen's restaurant, Miyama, in 2008, (Tr. 54:3-15), but claimed that he only learned Mu Jin Chen's name during an unrelated lawsuit in 2014, (see Tr. 46:21-47:8, 48:21-49:1, 54:8-11). According to Wang, he "didn't need to know" Mu Jin Chen's name when they negotiated and completed the sale of the restaurant in 2008, so he did not learn the name at that time. (Tr. 49:10-15, 54:8-18.) In summary, according to Wang, in 2008, he bought a restaurant--the name of which he did not know--from a man whom he had met but whose

name he did not know; in 2014, he learned the names of the restaurant and the man (Miyama and Mu Jin Chen, respectively); and in 2017, he affirmed to the Court that he did not "know who Mu Jin Chen is." This testimony both strains belief and contradicts itself. As a result, the Court does not credit Wang's testimony regarding his relationship with Wei and whether Wei worked at Ruby Sushi.

Accordingly, the Court finds that Wei worked four and one-half days per week at Ruby Asian Fusion in Woodbury and one day per week at Ruby Sushi in Plainview.

III. Wei's Hours

Wei testified that he worked fifty-four hours per week. (Tr. 9:19-24, 19:8-10.) Xi Chen testified that he worked no more than fifty hours per week, (Tr. 101:12-23), though she admitted that she estimated his hours based on the restaurant's schedule and that she did not keep records of the hours he worked, (Tr. 75:13-76:20).

"Where an employer fails to maintain adequate or accurate records of its employees' hours, the employee need only 'produce[ ] sufficient evidence to show the amount and extent of [his or her] work as a matter of just and reasonable inference.'" Pineda v. Frisolino, Inc., No. 15-CV-3774, 2017 WL 3835882, at *3 (S.D.N.Y. Aug. 29, 2017) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187, 1192, 90 L. Ed. 1187

(1946)) (alterations in original).  This is not a high burden and may be met by the employee's estimates of the hours he worked. Id.  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  Id. (quoting Anderson, 328 U.S. at 687-88, 66 S. Ct. at 1192).

Applying this framework, the Court concludes that Wei worked from 11:00 am to 3:00 pm and from 4:30 pm to 9:30 pm three days per week between Mondays and Thursdays (with one day off); from 11:00 am to 3:00 pm and 4:30 pm to 10:30 pm on Fridays; from 12:00 pm to 10:30 pm on Saturdays; and from 4:00 pm to 9:30 pm on Sundays, for a total of fifty-three hours per week.  While the Court credits Wei's testimony about his hours, it also credits Xi Chen's testimony regarding the hours that Ruby Asian Fusion operated.  (Tr. 67:15-20, 95:1-22.)  They largely accord with the hours listed on restaurant's menu, (Ruby Asian Fusion Menu), and her explanation regarding her later-than-scheduled openings on Sundays rang true, (Tr. 95:5-11).  However, her testimony that Wei began working at the same time the restaurant opened for business was not credible, since the Court finds it unlikely that kitchen workers like Wei, (Tr. 15:13-22), would be expected to begin work at the same time the restaurant opened.  Wei's testimony reflects a more likely scenario, that employees began working a half hour

before the restaurant opened.   (Tr. 9:19-24, 19:8-10; see Ruby Asian Fusion Menu.)

IV.   Wei's Pay

Each week, Wei was paid $700 in cash for his work.  (Tr. 18:1-8; Tr. 63:17-21.)   He was never given weekly payroll wage statements, (Tr. 18:21-19:3; Tr. 73:19-25, 100:6-8), or a wage notice upon hiring (or thereafter), (Tr. 15:23-16:5, 19:18-21; Tr. 99:9-14).

Xi Chen testified that she determined Wei's rate of pay. (Tr. 64:1-20.)  According to Xi Chen, she came up with the rate of $700 per week after asking friends who also own restaurants how much they pay their employees.  (Tr. 78:2-20.)  She testified that after talking to her friends about an acceptable rate of pay, she obtained additional information about minimum wage and overtime compensation from unspecified websites and "the news." (Tr. 78:23-79:18.)   She also testified that she sometimes determined salaries based on information from employment agencies. (Tr. 78:6-8.)

V.   Wei's Employers

As discussed above, the Court credits Wei's testimony that he worked at both Ruby Sushi and Ruby Asian Fusion.   The parties disagree as to whether Xi Chen or Wang was responsible for Wei's employment at the restaurants.

First, the parties dispute whether Xi Chen or Wang hired Wei and how she or he did so. According to Wei, he learned from a job post on a website that a Long Island restaurant was searching for a kitchen chef. (Tr. 6:25-7:21.) The post did not identify the name or address of the restaurant, giving only a phone number. (Tr. 7:22-8:2.) He called the restaurant, and the "male boss," whom Wei later learned was Wang, answered the phone. (Tr. 8:12-9:3, 14:14-19.) Wei and Wang discussed Wei's schedule and salary. (Tr. 9:9-10:4.)

According to Wang, he did not hire Wei or speak with him by phone, and he only knows Wei because he sometimes saw him at his wife's restaurant. (Tr. 42:10-43:23.)

According to Xi Chen, Wang did not hire Wei; Xi Chen hired him after finding him through a Flushing, New York employment agency called When Hua. (Tr. 61:18-20, 62:3-13, 72:11-13, 76:21-22.) She discovered the agency in a newspaper and called it, though she could not remember the names of any employees with whom she spoke. (Tr. 77:3-15.) Later, however, Xi Chen testified that Wei "came to our store [and] asked for work." (Tr. 79:8-9.) This appears to contradict her testimony that an agency connected them and to corroborate Wei's testimony that he called the restaurant in response to a job posting.

Based on the parties' demeanors at trial and the fact that Wei, overall, was a more credible witness, the Court accepts

Wei's testimony on this point. Thus, the Court finds that Wang hired Wei and dictated his schedule and salary.

Second, the parties dispute who controlled the conditions of Wei's employment. According to Wei, on his first day of work, he met with Wang to discuss his job responsibilities. (Tr. 14:20-15:22.) Wang told Wei that he would be working at both restaurants, with his Tuesdays spent at Ruby Sushi in Plainview and the other four and one-half workdays spent at Ruby Asian Fusion in Woodbury. (Tr. 16:6-17:2.) Wei believed Wang "manage[d] both locations." (Tr. 25:16-24.) Wang spent most of his time at Ruby Asian Fusion in Woodbury (nominally, Xi Chen's restaurant), and only some time at Ruby Sushi in Plainview (nominally, Wang's restaurant). (Tr. 24:7-15, 38:10-15.) Wang paid him $700 in cash once per week for his work at both restaurants. (Tr. 17:22-18:10.) While Wei insisted during direct examination that no one except Wang paid him his weekly wages, (Tr. 18:17-18), he admitted during cross-examination that Xi Chen sometimes paid him, (Tr. 23:25-24:1). Curiously, he did not mention Xi Chen at all during direct examination, though he acknowledged on cross-examination that she was one of his bosses, she sometimes told him "what to do," and she operated one of the restaurants when Wang was at the other. (Tr. 23:12-24:6, 26:4-11.) Wang terminated Wei's employment with both restaurants. (Tr. 19:22-20:15.)

Wang denied managing Ruby Asian Fusion, paying Wei, and firing Wei. (Tr. 41:22-42:9, 43:18-23.)

According to Xi Chen, she came to an agreement with Wei about what he would be paid each week, and she paid his salary. (Tr. 61:21-22, 63:12-18.) She fired him because he "play[ed] with his phone during his work hours. He ma[de] a lot of mistakes when delivering all the meals. Sometimes he was in a daze and we did not know what he was thinking about." (Tr. 67:2-8.)

While Wei's initial refusal to acknowledge that he sometimes worked for and was paid by Xi Chin undermined his credibility, the Court otherwise accepts his testimony regarding his employment. His testimony on other points came across as spontaneous and truthful, and his account of his employment at Ruby Sushi and Ruby Asian Fusion accords with the Court's other factual findings. Thus, based upon the relevant testimony and credibility of the witnesses, the Court finds that Wang was largely responsible for managing Wei's work and paying him, though Xi Chen had the authority to--and sometimes did--perform those tasks. Additionally, the Court finds that Wang fired Wei.

VI. <u>Facts Regarding the Relationship Between Ruby Asian Fusion and Ruby Sushi</u>

The Court notes several facts that reflect a close relationship between Ruby Asian Fusion and Ruby Sushi. <u>First</u>, the Ruby Asian Fusion menu and the Ruby Sushi menu are highly similar

in their layout, available dishes, prices, available discounts, hours (for example, each has separate lines for the periods during which each restaurant is closed in the afternoon from Monday through Friday), and overall design. (Compare Ruby Asian Fusion Menu with Ruby Sushi Menu, Pl. Ex. 5, D.E. 79-5.) Moreover, each lists "Copyright 2012 Ruby Restaurant. All Rights Reserved." on the bottom of its last page, and each includes what seems to be the same image of a menu item on its last page, though the image is larger on Ruby Sushi's menu. On cross-examination, counsel asked Xi Chen about the fact that "both menus on the first page offer 15 percent of[f] first online order," and she responded, "[n]owadays a lot of restaurants do that. What's the problem?" (Tr. 84:10-14.) Xi Chen testified that she hired "a printing place in Flushing," New York to design her menu. (Tr. 82:14-83:1.) She testified further that she thought Wang used the same printing company for his restaurant's menu. (Tr. 83:2-5.) Xi Chen's defensiveness when confronted with similarities between the menus led the Court to believe that the restaurants were more intimately involved than Xi Chen and Wang represented.

Second, the same stylized font is used for "Ruby" in "Ruby Asian Fusion" on the restaurant's awning, (Ruby Asian Fusion Awning, Pl. Ex. 3, D.E. 79-3), and for "Ruby" in "Ruby Sushi" on the Ruby Sushi menu, (Ruby Sushi Menu). When asked about this fact on cross-examination, Xi Chen responded, "[y]es, we found the

same design company, that's why the fonts are the same. What's the problem with that?" (Tr. 98:6-10.) Again, Xi Chen's defensiveness caused the Court to conclude that the restaurants were more closely connected than she and Wang testified.

Third, Xi Chen testified that Wang gave her advice when she opened the restaurant, and that "sometimes [they] will talk about" the restaurant, such as "how to bring up the business and where to buy fish and the fish would be more fresh." (Tr. 80:15-22.)

Fourth, when discussing the operation of her restaurant and aspects of Wei's employment, Xi Chen used the pronoun "we" instead of "I." For instance, when asked about what measures she took to ensure that she paid Wei correct overtime wages, she responded, "[w]e just gave him money, nothing else." (Tr. 92:22-93:14.) When discussing menu changes, she testified, "[s]ometimes there is some kind of change, but we didn't, like, change it immediately. So we'll post the new hours in front of her [sic] store." (Tr. 102:20-25.) She also used "we" when discussing the basis for arriving at Wei's rate of pay, (Tr. 78:4-10, 79:3-7), when discussing her hiring of employees through an agency, (Tr. 99:15-22), and when discussing the need to close Ruby Asian Fusion, (Tr. 58:13-18). Considering the above, the Court concludes that Xi Chen's use of "we" when discussing the operation

of her restaurant suggests that she and someone else--her husband-
-operated her restaurant jointly.

Fifth, Xi Chen testified that with the help of an
attorney, she prepared and filed all the paperwork necessary to
incorporate her restaurant. (Tr. 80:23-81:6.) She acknowledged
that the addresses listed for service of process with the New York
State Department of State for W Asian Cuisine (which operates as
Ruby Sushi) and Ruby Asian Cuisine (which operates as Ruby Asian
Fusion) are the same--76-70 47th Avenue, Elmhurst, New York, 11373.
(W Asian Cuisine NYS DOS Entry, Pl. Ex. 7, D.E. 79-7; Ruby Asian
Cuisine NYS DOS Entry, Pl. Ex. 8, D.E. 79-8.) Xi Chen explained
that the address "is [her] house residential address. . . .
Because we live together so it's the same address." (Tr. 81:19-
82:3.)

CONCLUSIONS OF LAW

Wei asserts claims for (1) unpaid overtime wages under
the FLSA and NYLL, (2) spread-of-hours pay under the NYLL,
(3) Defendants' failure to provide a wage notice under the NYLL,
and (4) Defendants' failure to provide wage statements under the
NYLL. (See JPTO § VI.; Wei Post-Trial Br., D.E. 84, at ECF pp. 4-
10.)

I.   Unpaid Overtime Wages

"The FLSA specifies that an employer must pay employees
who work in excess of forty hours during a workweek for the excess

hours 'at a rate not less than one and one-half times the regular rate at which he is employed,'" and the NYLL requires the same. <u>Frisolino</u>, 2017 WL 3835882, at *10 (quoting 29 U.S.C. § 207(a)(1)) (citing 12 N.Y.C.R.R. § 142-2.2); <u>see</u> 12 N.Y.C.R.R. § 146-1.4.  To recover unpaid overtime, Wei must establish that he "was the defendant's employee, that h[is] work involved inte[r]state activity, and that [ ]he worked hours for which [ ]he did not receive . . . overtime wages."[5]  <u>Pineda v. Tokana Cafe Bar Restorant Inc.</u>, No. 16-CV-1155, 2017 WL 1194242, at *2 (S.D.N.Y. Mar. 30, 2017) (citations omitted).

A.  <u>Wei's Employers</u>

"The FLSA broadly defines 'employer' as 'any person acting directly or indirectly in the interest of an employer in relation to an employee,' and likewise 'defines the verb "employ" expansively to mean "suffer or permit to work."'" <u>Frisolino</u>, 2017 WL 3835882, at *7 (quoting <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 326, 112 S. Ct. 1344, 1350, 117 L. Ed. 2d 581 (1992)). Each of a plaintiff's employers "is jointly and severally liable for all back wages and liquidated damages." <u>Id.</u> (quoting <u>Moon v. Kwon</u>, 248 F. Supp. 2d 201, 234 (S.D.N.Y. 2002)).

---

[5] Courts analyze FLSA and NYLL wage and hour claims in the same way, "except that the NYLL does not require plaintiffs to show a nexus with interstate commerce or a minimum amount of annual sales."  <u>Tokana</u>, 2017 WL 1194242, at *2 n.2 (citing <u>Alvarez v. Michael Anthony George Const. Corp.</u>, 15 F. Supp. 3d 285, 291 (E.D.N.Y. 2014)).

Even though Wei was listed as an employee of only Ruby Asian Cuisine, (Ruby Asian Cuisine Payroll, Defs. Ex. C, D.E. 81, at ECF p. 12), Wei argues that both W Asian Cuisine (Ruby Sushi) and Ruby Asian Cuisine (Ruby Asian Fusion) are liable for overtime-wage violations because they operated as a "single integrated enterprise." (Wei Post-Trial Br. at ECF pp. 6-7.) Under this theory of liability, "'where two nominally separate entities'-- such as 'separate corporations under common ownership and management'--'are actually part of a single integrated enterprise,' employees 'may impose liability for certain violations of employment law not only on the[ir] nominal employer but also on another entity comprising part of the single integrated employer.'" Draskovic v. Oneota Assocs., LLC, No. 17-CV-5085, 2019 WL 783033, at *6 (E.D.N.Y. Feb. 21, 2019) (alteration in original) (quoting Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005)). While the "Second Circuit has not expressly ruled on the question" of whether this doctrine should be applied in FLSA cases, "district courts in this circuit have regularly applied the doctrine in this context." Id. (citations omitted). Thus, the Court applies the doctrine here.

Under the single-integrated-employer standard, "'courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'" Id. (quoting Juarez v. 449

Rest., Inc., 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014)). "With respect to restaurants in particular, 'facts that go to the existence of a single, integrated enterprise include common décor, name, menu and marketing; the use of the same employees at multiple locations; the transfer of items between restaurants; use of the same central payroll office, common storage space and leases; and the distribution of common employee guidelines and procedures across different businesses.'" Marin v. APU Foods Corp., No. 17-CV-3224, 2018 WL 1462236, at *2 (E.D.N.Y. Feb. 26, 2018) (quoting Khereed v. W. 112th St. Rest. Grp. LLC, No. 15-CV-1363, 2016 WL 590233, at *4 (S.D.N.Y. Feb. 11, 2016)), R&R adopted, 2018 WL 1459488 (E.D.N.Y. Mar. 23, 2018).

The Court concludes that Wang and Xi Chen operated Ruby Sushi and Ruby Asian Fusion as a single, integrated enterprise. To the first three factors of the single-integrated-enterprise standard, Wang's and Xi Chen's restaurants had interrelated operations, centralized control of labor relations, and common management. Wang and Chen each shared management authority over both restaurants, with one of them managing one restaurant while the second managed the other restaurant. Additionally, they shared at least one employee: Pursuant to Wang's instructions, Wei worked at both restaurants, spending four and one-half days per week in the kitchen of Ruby Asian Fusion and one day per week performing the same duties in the kitchen of Ruby Sushi. Wei was paid a

single amount of money for his work at both restaurants; sometimes Wang paid him, and sometimes Xi Chen paid him. Similarly, sometimes Wang supervised his work, and sometimes Xi Chen "t[old] [him] what to do." (Tr. 23:23-24.) When Wang fired Wei, Wei stopped working at both restaurants. (Tr. 20:2-15.) The Court also notes the menus' marked similarities in style, layout, and content; the "15% OFF for First Online Order" offer on each menu; the restaurants' shared use of "Ruby"; the distinctive font that both restaurants used for "Ruby"; and Xi Chen's defensive reaction to questions regarding those similarities. Finally, the Court notes Xi Chen's persistent use of "we" when referring to her restaurant's operations, which as discussed above, leads the Court to conclude that she operated the restaurants jointly with Wang.

Regarding the fourth factor of the single-integrated-enterprise standard--the restaurants' joint ownership or financial control--on paper, Wang owned Ruby Sushi and Xi Chen owned Ruby Asian Fusion. However, Wang and Xi Chen are married to each other, each of their restaurants served the same type of food, they discussed with each other "how to bring up the business" and where to buy ingredients, and they each listed their shared residence as their respective restaurant's address for service of process. Further, even though Xi Chen was listed as the owner of Ruby Asian Fusion in Woodbury, (see JPTO §§ VII.3-4), Wang spent more of his time at Ruby Asian Fusion in Woodbury than he did at "his"

restaurant, Ruby Sushi in Plainview, (Tr. 24:7-15).  These facts reflect the couple's shared ownership or financial control of the restaurants.

Additionally, the Court finds that Wang and Xi Chen were each an "employer" of Wei.  In deciding whether an individual defendant is an "employer," "[t]he Second Circuit has instructed district courts to look to 'whether the alleged employer possessed the power to control the workers in question, with an eye to the "economic reality" presented by the facts of each case.'" Draskovic, 2019 WL 783033, at *7 (E.D.N.Y. Feb. 21, 2019) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)). Under the formal-control test, "the relevant factors include 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" Frisolino, 2017 WL 3835882, at *7 (quoting RSR, 172 F.3d at 139). "That said, '[n]o one of the four factors standing alone is dispositive.  Instead, the "economic reality" test encompasses the totality of circumstances. . . .'" Draskovic, 2019 WL 783033, at *7 (alterations in original) (quoting RSR, 172 F.3d at 139)).

As discussed, Wang hired Wei, fired him, and set his schedule.  At times, he paid Wei's wages and supervised his work. Moreover, according to the joint stipulations of fact from the

parties' JPTO, he "manages and makes all business decisions" on behalf of Ruby Sushi, "including but not limited to the amount in salary the employee will receive, and the number of hours employees will work." (JPTO § VII. 5 & 6). Accordingly, Wang was Wei's "employer" under the formal-control test.

Additionally, at times, Xi Chen paid Wei and supervised his work. She managed one restaurant while Wang managed the other. Further, the parties stipulated that Xi Chen "manage[d] and ma[de] all business decisions" on behalf of Ruby Asian Fusion, "including but not limited to the amount in salary the employee will receive, and the number of hours employees will work." (JPTO § VII. 3 & 4). Xi Chen also testified to deciding what wage Wei should be paid, tracking employees' hours (though she did not keep records of those hours), and firing Wei. While the Court did not credit her testimony that she fired Wei, the Court has no reason to doubt that she had the power to do so. Considering these facts, the Court finds that Xi Chen was also Wei's "employer" under the formal-control test.

In sum, the Court finds that under the FLSA and NYLL, Ruby Asian Cuisine (Ruby Asian Fusion) and W Asian Cuisine (Ruby Sushi) were a single, integrated enterprise that employed Wei and that Xi Chen and Wang were each an employer of Wei.

B.    FLSA's Interstate Commerce Requirement

Having found that Ruby Sushi and Ruby Asian Cuisine were a single, integrated enterprise that, along with Wang and Xi Chen, employed Wei, the Court turns to whether Wei's employment is covered by the FLSA.  The FLSA's overtime requirements "provide coverage to those 'employees who . . . [are] engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce.'"  Thompson v. Hyun Suk Park, No. 18-CV-0006, 2019 WL 1299194, at *4 (E.D.N.Y. Mar. 5, 2019) (quoting Shim v. Millennium Grp., No. 08-CV-4022, 2009 WL 211367, at *2 (E.D.N.Y. Jan. 28, 2009)), R&R adopted, 2019 WL 1298563 (E.D.N.Y. Mar. 20, 2019) (alterations in original).  Wei argues that he is covered under the second category, which is commonly known as "enterprise" coverage.  See id.  "To establish enterprise coverage, the plaintiff must demonstrate that he was employed by an enterprise which is defined under the FLSA as one wherein '(1) employees engaged in commerce or in the production of goods for commerce, or employees handled, sold, or otherwise worked on goods or materials that have been moved in or produced for commerce by any person, and (2) [that] has no less than $500,000 in annual gross volume of sales made or business done.'"  Id. (quoting Locke v. St. Augustine's Episcopal Church, 690 F. Supp. 2d 77, 84 (E.D.N.Y. 2010)) (alteration in original).

The parties have stipulated to the first factor, (JPTO § VII.2), but they dispute whether Wei can satisfy the second. Ruby Asian Fusion's 2016 tax return reflects gross revenues of $418,989. (Ruby Asian Fusion 2016 Tax Return, Def. Ex. D, D.E. 81-1.) Defendants argue that since Ruby Asian Fusion--which they aver was the only restaurant at which Wei worked--did not earn $500,000 in annual gross sales during Wei's employment, there is no enterprise coverage under the FLSA. (Defs. Post-Trial Br., D.E. 87, at 7-8.) Wei argues that because Ruby Sushi and Ruby Asian Fusion were a single, integrated enterprise, the Court should aggregate their gross annual revenues, which almost certainly would exceed the $500,000 threshold and satisfy the second enterprise-coverage requirement. (Wei Post-Trial Br. at 6-7.) There is no indication of Ruby Sushi's gross annual sales during the time Wei was employed.

As discussed above, the Court finds that Ruby Asian Fusion and Ruby Sushi were two restaurant locations that made up a single, integrated enterprise--that is, they were a single employer for FLSA purposes. It follows that their gross annual sales may be combined to determine whether they satisfy the $500,000 enterprise-coverage threshold. See Draskovic, 2019 WL 783033, at *7 (aggregating employees of defendant corporations that formed a single, integrated enterprise and finding them to be a "large employer" under the NYLL for minimum wage purposes).

Though there is no evidence of Ruby Sushi's revenues in 2016--when Defendants employed Wei--Ruby Asian Fusion's revenues that year totaled $418,989, or $81,011 less than the $500,000 threshold. (Ruby Asian Fusion 2016 Tax Return.)  Given that Ruby Sushi had been open years longer and was more financially healthy than Ruby Asian Fusion, which Xi Chen testified has since closed, it is more likely than not that Ruby Sushi earned more than the $81,011 shortfall during 2016.  Thus, Wei has satisfied the second element of enterprise coverage and the FLSA applied to his employment with Defendants.[6]

   C.   Overtime Hours

        The FLSA and regulations issued pursuant to the NYLL both require that "an employer must pay employees who work in excess of forty hours during a workweek for the excess hours 'at a rate not less than one and one-half times the regular rate at which he is employed.'"  Frisolino, 2017 WL 3835882, at *10 (quoting 29 U.S.C. § 207(a)(1)) (citing 12 N.Y.C.R.R. § 142-2.2). "'To establish liability under the FLSA on a claim for unpaid

---

[6] Even if Wei were unable to satisfy the threshold, the result would remain the same:  The Court would exercise supplemental jurisdiction over Wei's state law claims and reach the same results under New York law.  Salustio v. 106 Columbia Deli Corp., 264 F. Supp. 3d 540, 550-53 (S.D.N.Y. 2017) (holding after bench trial that failure to satisfy $500,000 enterprise-coverage threshold did not divest court of subject matter jurisdiction, dismissing FLSA claims for failure to meet threshold, and exercising supplemental jurisdiction over NYLL claims).

overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" Id. (quoting Kuebel v. Black & Decker Inc., 643 F.3d 352, 361 (2d Cir. 2011).

Based on the Court's findings of fact, Defendants violated the FLSA and NYLL by failing to pay overtime wages to Wei.  Wei received a fixed salary of $700 per week for his fifty-three hours of work, and there was no testimony or evidence that the parties had ever discussed Wei's hourly or overtime rates of pay or how his compensation would be calculated.  Thus, he was not paid one and one-half times his regular rate of pay for hours worked over forty each week.

The Court turns to calculating damages.  The first step of this calculation is to determine Wei's regular rate of pay.  "Under the FLSA, the 'regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked . . . .'" Frisolino, 2017 WL 3835882, at *10 (quoting 29 C.F.R. § 788.109).  Under the NYLL, the regular rate is calculated "by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." 12 N.Y.C.R.R. § 146-3.5 (emphasis added).  "In actions to recover unpaid minimum wages and overtime

pay under both the FLSA and the NYLL, Plaintiffs may recover under whichever statute provides the greater relief." <u>Frisolino</u>, 2017 WL 3835882, at \*11 (citations omitted). Here, the NYLL allows for the greater recovery because Wei's regular rate of pay will be determined by dividing his weekly wage by forty hours, rather than by the fifty-three hours he agreed to work each week. Thus, the Court calculates damages pursuant to the NYLL.

As discussed, the Court finds that Wei was paid $700 per week for each of his fifty-three-hour workweeks between August 15, 2016 and December 20, 2016 (eighteen weeks and one day, or 18.14 weeks). Wei's regular rate of pay under the NYLL is $700/40 hours, or $17.50 per hour. His overtime rate of pay is 1.5 x $17.50 per hour, or $26.25 per hour. Including an overtime premium, his proper weekly wage was $17.50 x 40 for the first forty hours--$700--plus $26.25 x 13 for his thirteen overtime hours--$341.25--for a total of $1,041.25 per week. Therefore, the amount of damages for unpaid overtime wages is $341.25 for each week Wei worked, or $341.25 x 18.14, for a total of $6,190.28.

D.   <u>Liquidated Damages</u>

"Under the FLSA, a plaintiff is presumptively entitled to 'liquidated damages equal in amount to actual damages,' unless 'the employer shows that, despite its failure to pay appropriate wages, it acted in subjective "good faith" with objectively "reasonable grounds" for believing that its acts or omissions did

not violate the FLSA.'" Draskovic, 2019 WL 783033, at *13 (quoting Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 150 (2d Cir. 2008)). "'[G]ood faith'" . . . "'requires that an employer first take active steps to ascertain the dictates of the FLSA, and then move to comply with them.'" Id. (quoting Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997)). "As a result, the employer's 'burden is a difficult one, with double damages being the norm and single damages the exception.'" Id. (quoting RSR, 172 F.3d at 142).

"NYLL also provides for liquidated damages 'unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law.'" Valle v. Gordon Chen's Kitchen LLC, 254 F. Supp. 3d 665, 678 (S.D.N.Y. 2017) (quoting N.Y. Lab. L. § 198(1-a)). The FLSA's and the NYLL's liquidated damages standards mirror each other and "cover the same ground." See Rana v. Islam, 887 F.3d 118, 123 (2d Cir. 2018).

Here, Defendants are liable for liquidated damages because they have not presented a good-faith basis or "reasonable grounds for their belief that they were not in violation" of the overtime-wage requirements. See Valle, 254 F. Supp. 3d at 678. Xi Chen testified to her efforts to pay proper wages, which consisted of talking to her friends who own restaurants about what wages they paid their employees and reading unspecified websites and "the news" about minimum wage and overtime requirements.

(Tr. 78:1-79:18.)  These actions do not demonstrate a good-faith basis or a reasonable ground for belief that she acted according to the law.  Moreover, Defendants' failure to provide a wage notice or wage statements describing Wei's regular and overtime rates of pay and their failure to keep records of hours worked supports the Court's finding that Defendants did not have a good-faith basis or reasonable ground for their belief that they were complying with labor laws.

Because "the NYLL and FLSA [do] not allow[ ] duplicative liquidated damages for the same course of conduct," Wei is due only one award of liquidated damages for unpaid overtime wages. See Rana, 887 F.3d at 123.  The NYLL allows for an award of prejudgment interest in addition to liquidated damages, N.Y. Lab. L. § 198(1-a), but the FLSA does not, Frisolino, 2017 WL 3835882, at *13.  Given that fact and that "Plaintiffs may recover under whichever statute provides the greater relief," id. at *11 (citations omitted), and considering that the Court has awarded Wei unpaid overtime wages under the NYLL, the Court awards Wei liquidated damages under the NYLL in the amount of $6,190.28, one-hundred percent of his unpaid overtime wages.  See Rana, 887 F.3d at 123 ("The defendants did not argue the point, and pursued a position of all or nothing; so, to be prudent, the plaintiff should receive the larger of the two liquidated damages awards," which is available under the NYLL.)

## II. Spread-of-Hours Pay

Wei is also entitled to spread-of-hours pay. "New York law requires, separate from any . . . overtime award, that 'an employee whose workday is longer than ten hours must receive one hour's pay at the basic minimum hourly wage rate.'" Valle, 254 F. Supp. 3d at 675 (quoting Galeana v. Lemongrass on Broadway Corp., 120 F. Supp. 3d 306, 319 (S.D.N.Y. 2014)); see 12 N.Y.C.R.R. § 146-1.6. Here, as discussed, Wei's workday exceeded ten hours five days per week during his time working for Defendants. (See supra Findings of Fact § III.) Based on his schedule, the Court calculates that Wei's workday exceeded ten hours ninety-one times during his tenure. The minimum wage rate during Wei's employment in 2016 was $9.00 per hour. N.Y. Lab. L. § 652(1); (JPTO § VII, Stip. of Law ¶ 4.) Thus, Wei is awarded spread-of-hours pay calculated by multiplying the number of days his workday exceeded ten hours by the applicable minimum wage rate--91 x $9.00--which totals $819.00.

Additionally, as discussed above, the NYLL provides for liquidated damages for a violation unless the employer can show that it had a good-faith basis for its belief that it complied with the law. Defendants have not established a basis for any belief that they were not required to make spread-of-hours payments. See Valle, 254 F. Supp. 3d at 278. Therefore, Wei is

awarded liquidated damages in an amount equal to his unpaid spread-of-hours pay, $819.00.

III. <u>Wage Notice and Wage Statement Violations</u>

Under New York law, at the time of hiring, employers must provide employees with a wage notice. N.Y. Lab. L. § 195(1)(a). If an employee is not provided with this notice within ten business days of his first day of work, he "may recover . . . damages of fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars." N.Y. Lab. L. § 198(1-b). Defendants never provided Wei with a wage notice. Based on Wei's schedule and dates of employment, the Court calculates that Wei worked 110 days. He is awarded the statutory maximum of $5,000 for Defendants' failure to provide him with a wage notice.

Additionally, under New York Labor Law § 195(3), an employer must "furnish each employee with a statement with every payment of wages" that lists, among other things, "the dates of work covered by that payment of wages; . . . rate or rates of pay and basis thereof . . . ; gross wages; . . . and net wages." N.Y. Lab. L. § 195(3). Failure to provide wage statements to an employee allows him to recover "damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars." N.Y. Lab. L. § 198(1-d). While "[t]he statute states that the

plaintiff is entitled to $ 250 per 'work day' in which the violation occurs . . . , it is obvious that the intent of the statute was to only count work days on which wages are actually paid, and not to count work days in between pay periods." <u>Haifeng Xie v. Sakura Kai I Inc.</u>, No. 17-CV-7509, 2019 WL 1568756, at *9 n.8 (E.D.N.Y. Apr. 11, 2019) (citations omitted); <u>see</u> <u>Draskovic</u>, 2019 WL 783033, at *16 (calculating damages based on number of pay periods). Defendants never provided Wei with a wage statement. Since he was paid weekly, Wei is awarded $250 per week for each of the nineteen pay periods he worked, for a total of $4,750.

IV. <u>Prejudgment Interest</u>

Under New York law, prejudgment interest--in addition to liquidated damages--may be awarded on a plaintiff's unpaid wages. N.Y. Lab. L. § 198(1-a). "'Courts applying the NYLL in wage-and-hour cases often choose the midpoint of the plaintiff's employment' in computing prejudgment interest." <u>Sakura Kai I Inc.</u>, 2019 WL 1568756, at *11; <u>see</u> N.Y. C.P.L.R. 5001(b). The prejudgment interest rate is 9% per annum. N.Y. C.P.L.R. 5004; see <u>Sakura Kai I Inc.</u>, 2019 WL 1568756, at *11.

As discussed, Wei worked from August 15, 2016 to December 20, 2016, so the Court selects the midpoint date of October 17, 2016 from which to calculate prejudgment interest. Thus, the Court awards prejudgment interest of nine percent per year running from October 17, 2016 through the date of entry of

judgment on the principal amount of $7,009.28, consisting of $6,190.28 in unpaid overtime wages and $819.00 in unpaid spread-of-hours pay.

V.   Post-Judgment Interest

"Post-judgment interest is mandatory on awards in civil cases." Frisolino, 2017 WL 3835882, at *13 (quoting Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008)).   Therefore, Wei is awarded post-judgment interest calculated pursuant to 28 U.S.C. § 1961.

VI.  Attorneys' Fees and Costs

Wei requests leave to file a motion for attorneys' fees. (Wei Post-Trial Br. at 10.)  His request is GRANTED, and his motion shall be filed within fourteen (14) days of the date of entry of judgment.

CONCLUSION

For the foregoing reasons, Cao's claims against all Defendants and Wei's claims against Mu Jin Chen and Miyama, Inc. are DISMISSED WITH PREJUDICE.

Xi Chen, Ming Hang Wang, W Asian Cuisine Inc., and Ruby Asian Cuisine Inc. are jointly and severally liable to Wei for the following amounts:

| Category | Amount |
|---|---|
| Overtime | $6,190.28 |
| Liquidated Damages - Overtime | $6,190.28 |
| Spread of Hours | $819.00 |
| Liquidated Damages - Spread of Hours | $819.00 |

| | |
|---|---|
| Wage Notice | $5,000.00 |
| Wage Statements | $4,750.00 |
| Pre-Judgment Interest of 9% per Year Running from October 17, 2016 Through Date of Entry of Judgment on Principal Balance of $7,069.46 | To be calculated by Clerk of the Court |
| **Total** | $23,768.56 + Interest |

The Clerk of the Court is respectfully directed to calculate the amount of prejudgment interest as of the date of entry of judgment and enter judgment accordingly.

Wei shall file a motion for attorneys' fees within fourteen (14) days of the date of entry of judgment; Defendants' opposition shall be filed within fourteen (14) days thereafter; and Wei's reply, if any, shall be filed within seven (7) days after the filing of Defendants' opposition.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated:     September   10  , 2019
           Central Islip, New York